**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| FEDERAL INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 2:08-cv-0128-RWS |
| | : | |
| UNITED COMMUNITY BANKS, | : | |
| INC. and UNITED COMMUNITY | : | |
| BANK, | : | |
| | : | |
| Defendants. | | |

## <u>ORDER</u>

This case comes before the Court on Plaintiff Federal Insurance

Company's Motion for Summary Judgment as to Count I of its Complaint for

Declaratory Judgment and Counts I and III of Defendants' Counterclaim [65],

Defendants United Community Banks, Inc. and United Community Bank's

Motion for Partial Summary Judgment [67], Plaintiff Federal Insurance

Company's Notice of Objection [76] and Plaintiff Federal Insurance

Company's Second Notice of Objection [86]. After a review of the record, the

Court enters the following Order.

**I. Factual Background**

Plaintiff Federal Insurance Company ("Federal") issued two financial institution bonds to Defendants United Community Banks, Inc. and United Community Bank (jointly, "UCB")–Primary Financial Institution Bond number 82051823DFI (the "Bond") and Financial Institution Excess Bond number 82122805 Dfi (the "Excess Bond").  (Plaintiff's Statement of Undisputed Material Facts ("Pl.'s Facts"), Dkt. No. [65-1] at ¶1).  This case concerns whether Plaintiff had an obligation to cover a loss allegedly caused by a closing attorney's fraudulent dealings.

A. Village of Penland Lot Loans

Peerless Real Estate Services, Inc. ("Peerless") and/or its predecessors purchased approximately 1400 acres in Spruce Pine, North Carolina for the purpose of creating a residential development–the Village of Penland. (Defendants' Response to Plaintiff's Statement of Undisputed Material Facts ("Defs.' Resp. Facts"), Dkt. No. [78-1] at ¶¶ 6, 8).  UCB first became involved with the property when Peerless requested commercial development loans. (Id. at ¶ 18.) To discuss the possible loan, UCB representatives met the owner of Peerless, Tony Porter, and Randy Carpenter, who UCB understood at the time

2

to be the surveyor and engineer on the project, at the property. (Id. at ¶ 19-20.)

However, these commercial loans were never issued. (Id. at ¶ 22.).

Peerless subsequently subdivided the land into the Village of Penland

development. (Id. at ¶¶ 7-8). Between October 2004 and March 2007, UCB

financed the purchase of ninety residential lots within the development to

individual borrowers. (Id. at ¶ 7). In February 2006, Peerless sent UCB a letter

proposing a financing arrangement in which a Peerless affiliate would loan the

down payments to each borrower. (Hinning Dep., Dkt. No. [67-23] at 36:23-

38:14). However, UCB denied this request and subsequently required that the

funds come from the borrowers. (Id.; Edwards Dep., Dkt. No. [67-17] at 86:7-

90:16)). However, for all of the loans, UCB loaned between seventy-five and

eighty percent of the purchase price. (Plaintiff's Response to Defendants'

Statement of Undisputed Material Facts ("Pl.'s Resp. Facts"), Dkt. No. [74] at ¶

67).

The majority of the ninety loans were closed by Randy Carpenter, a local

North Carolina attorney (the same Randy Carpenter that UCB had met at the

property as the surveyor/engineer). (Defs.' Resp. Facts, Dkt. No. [78-1] at ¶ 9).

By this time, UCB had learned that Carpenter was in fact an attorney and had

3

placed him on their "List of Approved Attorneys." (Pl.'s Resp. Facts, Dkt. No. [74] at ¶ 29).

As the closing attorney, Carpenter represented the seller, buyer and lender–none of the parties were represented by separate counsel. (North Carolina Bar Order ("Bar Order"), Dkt. No. [78-28] at ¶ 15; Pl's Resp. Facts, Dkt No. [74] at ¶ 27). However, Carpenter was typically selected–outside of UCB's initial, more general "List of Approval"–by the individual borrower or seller.  (Defs.' Resp. Facts, Dkt. No. [78-1] at ¶ 28).

In this role, Carpenter, or a non-attorney under his supervision, prepared the HUD-1 Settlement Statements which stated the amount of the loan and the amount due from borrowers. (Id. at ¶ 23; Pl.'s Resp. Facts, Dkt No. [74] at ¶ 33). He issued title opinions and obtained title insurance on UCB's behalf. (Pl.'s Resp. Facts, Dkt No. [74] at ¶ 34).  Carpenter was also the trustee on the deeds of trust between the borrower and UCB and disbursed loan proceeds in conjunction with the closings.  (Id. at ¶¶ 32, 35). But, UCB did not typically send him written instructions–doing so only four times. (Defs.' Resp. Facts, Dkt. No. [78-1] at ¶¶ 32-33).  Additionally, UCB did not enter into any written

agreement with Carpenter which was labeled a "retainer agreement." (Id. at ¶ 41).

Regarding payment, Carpenter's fees were paid from the seller's funds at closing. (Id. at ¶ 31). He was not on UCB's payroll, nor did he receive an IRS Form W-2 or W-4 from UCB. (Id. at ¶ 29). Additionally, as noted on the HUD-1 Settlement Statements, Carpenter was sometimes paid money above and beyond a typical closing fee. (Pl.'s Resp. Facts, Dkt No. [74] at ¶¶ 55-57 )

B. Claims under the Bonds

In June 2007, UCB first contacted Federal regarding a possible loss under the Bonds. (Dec. Maillet, Dkt. No. [65-21] at ¶ 6). Ultimately, the Village of Penland project was a scheme whereby Peerless obtained borrowers and assisted them in financing. (O'Rourke Bill of Info., Dkt. No. [67-22] at ¶ 4).[1] Borrowers were told that the loan proceeds would be distributed to Peerless to develop the property and Peerless would lease the land from the borrowers after closing. Id. Therefore, the borrowers would not have to make their mortgage payments, and eventually, Peerless would buy back the land from them so they

---

[1] These facts regarding the Village of Penland "scheme" are drawn primarily from Neil O'Rourke's Bill of Information. The Court makes no findings with regard to the facts contained herein.

would each realize a profit.  Id.  However, in order for the scheme to work, it

required a "Ponzi-scheme"-like pyramid–the new funds obtained went to pay

the older borrower's mortgages.  Id. at 6.  Ultimately, when Peerless collapsed

and stopped making mortgage payments, UCB claimed approximately $24

million in debt due to unpaid loans.  (Defs.' Resp. Facts, Dkt. No. [78-1] at ¶

46).

UCB claimed coverage under Insuring Clause 1 of the Bonds.  It reads in

relevant part:

1.A. Employee
. . .
   B. Trade or Loan
Loss resulting directly from dishonest acts of any **Employee**,
committed alone or in collusion with others except with a director
or trustee of the ASSURED who is not an **Employee**, which arises
totally or partially from:
. . .
   (2) any **Loan**,
provided, however, the ASSURED shall first establish that the loss
was directly caused by dishonest acts of any **Employee** which
result in improper personal financial gain to such **Employee** and
which acts were committed with the intent to cause the ASSURED
to sustain such loss.
. . .
Definitions
. . .
K. **Employee** means:
. . .

6

> (4) an attorney retained by the ASSURED and an employee of
> such attorney while either of them is performing legal services for
> the ASSURED

Dkt. No. [65-5] at 1, 11.  UCB claimed that Carpenter met the definition of an

"**Employee**" under the Bonds and thus coverage was proper.  Namely, UCB

alleged that Carpenter was dishonest with UCB by certifying false HUD-1

Settlement Statements–indicating the buyer had paid the down payment when in

fact they had not.  Further, UCB claimed that Carpenter had received an

improper personal financial gain as a part of the Village of Penland scheme.

However, Federal subsequently denied the claim thirteen months later on

July 7, 2008. (Dec. Maillet Dkt. No. [65-21] at ¶13).  During this thirteen

months, Federal reviewed thousands of documents and completed in-person

interviews with UCB employees who had relevant knowledge.   (Defs.' Resp.

Facts, Dkt. No. [78-1] at ¶¶  49-51). Following this denial, Federal filed the

present action in this Court seeking a declaratory judgment regarding its

obligations under the Bond. (See Complaint, Dkt. No. [1]).  In response, UCB

filed a counterclaim for Breach of Insurance Contract and Bad Faith.  (See

Answer, Dkt. No. [6]). Each party moved for summary judgment on various

7

counts and Federal filed two notices of objection challenging UCB's evidentiary support on the foregoing motions.

## II. Evidentiary Objections

### A. Federal's Notice of Objection

Plaintiff  moves this Court to exclude the following exhibits offered in support of Defendants' Motion for Partial Summary Judgment [67]: 1) Randy Carpenter's North Carolina State Bar Order, 2) Paragraphs 6, 12-19, and 21 of Jason McCarter's Affidavit, 3) Joseph Grier's Affidavit and Attached Documents, and 4) Neil O'Rourke's Bill of Information and Subsequent Plea. (See Plaintiff's Notice of Objection ("Pl.'s First Obj."), Dkt. No. [76] at 2).

### 1. Randy Carpenter's North Carolina State Bar Order

#### a. Relevance

Plaintiff argues that Randy Carpenter's North Carolina State Bar Order ("Bar Order") is inadmissible as irrelevant or, alternatively, should be excluded under Federal Rule of Evidence 403. (See Pl.'s First Obj., Dkt. No. [76] at 4-12).  Federal Rule of Evidence 401 defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." FED. R. EVID. 401.  Rule 402 in turn provides that

relevant evidence is generally admissible, but "[e]vidence which is not relevant

is not admissible." FED. R. EVID. 402.  Additionally, courts are not permitted to

consider weight or sufficiency of evidence when determining relevancy.

Robinson v. Runyon, 149 F.3d 507, 512 (6th Cir. 1998). "The Rule[s'] basic

standard of relevance is thus a liberal one." Daubert v. Merrell Dow Pharm.,

Inc., 509 U.S. 579, 587 (1993).

Carpenter's Bar Order was entered by the Disciplinary Hearing

Committee of the North Carolina State Bar.  This order sets out various findings

of fact and law relating to the disbarment of Randy Carpenter, the attorney

whose conduct is at issue in this case.  Plaintiff argues that Carpenter's Bar

Order is irrelevant because the ethical standards under which Carpenter was

judged are not at issue in this case and the Bar's ultimate conclusions were not

only based on his interactions with UCB but also three other lenders.  Further, it

claims the State Bar's factual conclusion that Carpenter "represented the seller,

the buyer/borrower, and the lender" is irrelevant to the determination of whether

Carpenter was "retained" as required by the operative policy language here. See

Dkt. No. 67, Ex. E at ¶ 15 (containing the factual finding that Carpenter

9

represented the above-listed three parties). Defendants, in response, claim that the Bar Order is relevant as to Carpenter's dishonesty, whether he was an **"Employee"** under the policy, and whether he received an improper personal gain.

This Court finds that the Bar Order is probative of Carpenter's actions which underlie this case.   At a minimum, the fact that the developers concocted a "scheme" and Carpenter worked heavily with them on this project makes it more likely that Carpenter was in fact dishonest.  Further, completing legal services for UCB is probative as to whether Carpenter was ultimately retained. The fact that the Bar Order incorporated four lenders and completed its investigation under ethical responsibility standards goes to the weight of the conclusions - not to their admissibility.

Rule 403, however, provides that even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.  "Because Rule 403 permits a trial court to exclude relevant evidence, it is an extraordinary remedy to be used

AO 72A
(Rev.8/82)

sparingly." <u>United States v. Griffin</u>, 778 F.2d 707, 709 (11th Cir. 1985).

Further, "[e]xcluding evidence as being more prejudicial than probative at the

pretrial stage is an extreme measure that is rarely necessary, because no harm is

done in admitting it at that stage." <u>In re Paoli R.R. Yard P.C.B. Litig.</u>, 916 F.2d

829, 859 (3d. Cir. 1990).

     Plaintiff contends that even if relevant, that relevance is substantially

outweighed by unfair prejudice or confusion of the issues.   Plaintiff again

stresses the multiple-lender involvement and adds that it is prejudiced because it

was not a party to the disciplinary proceeding nor was it able to cross-examine

the witnesses there.  In response, Defendants maintain that this evidence's

relevance outweighs any alleged prejudice–the evidence goes to prove key

issues in the case.  Further, there is no confusion concern as the Penland lot

scheme was common to all of the lenders.

     At this stage of the proceeding, this Court will admit the Bar Order.

Juror confusion and unfair prejudice do not have the same consequences at the

summary judgment stage as they do at trial.  This Court can adequately

determine the weight of the evidence without resorting to the "extraordinary

remedy" of exclusion.

AO 72A
(Rev.8/82)

b. Hearsay

Additionally, Plaintiff challenges Defendants' contention that the Bar Order would clearly meet the public-records hearsay exception. "Rule 803(8)(c) allows into evidence public reports that (1) set forth factual findings (2) made pursuant to authority granted by law (3) that the judge finds trustworthy." <u>Hines v. Brandon Steel Decks, Inc.</u>, 886 F.2d 299, 302 (11th Cir. 1989).   Therefore, "803(8)(c) does not provide for the admissibility of the legal conclusions contained within an otherwise admissible report." <u>Id.</u>

Plaintiff contends that because the Bar Order makes conclusions of law and orders of discipline, it is quasi-judicial and therefore not subject to the public records exception to the hearsay rule.  Initially, the North Carolina State Bar is a trustworthy fact-finder whose authority derives from state law.  (<u>See</u> Bar Order, Dkt. No. [67-11], ¶1).   In fact, the Bar is entrusted to make findings of fact regarding its member's misconduct.  <u>Id.</u>  However, this Court agrees with Plaintiff regarding the admissibility of the Bar's legal and disciplinary findings.  Therefore, this Court **SUSTAINS** Plaintiff's objection **in part** and will only admit the "Findings of Fact" found in the Bar Order.

12

### 2. Paragraphs 6, 12-19, and 21 of Jason McCarter's Affidavit

Plaintiff next challenges Paragraphs 6, 12-19, and 21 of Jason McCarter's Affidavit for lack of personal knowledge and foundation.  (Pl.'s First Obj., Dkt. No. [76] at 12).  Pursuant to Fed. R. Civ. 56(e), supporting affidavits must be "made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." <u>See also</u>  <u>Int'l Ship Repair & Marine Servs. Inc., v. St. Paul Fire & Marine Ins. Co.</u>, 906 F. Supp. 645, 648 (M.D. Fla. 1995) (noting Rule 56(e)'s requirements that supporting affidavit must be based on personal knowledge, not be conclusory, and set forth facts admissible in evidence).

Plaintiff challenges the affidavit of Defendants' 30(b)(6) witness, Jason McCarter, on the grounds that he was not involved in the underwriting or origination of any of the loans; therefore, his opinions lack personal knowledge and foundation regarding what UCB knew at the time of the loan issuances or what Carpenter knew and/or was told by UCB.  Further, Plaintiff argues there is no basis for McCarter's "expert" opinions regarding banking standards, underwriting policies, and hypothetical outcomes to changed circumstances.

13

Defendants respond that Carpenter has sufficient knowledge through his review of the at-issue loan files, conversations with involved borrowers and UCB employees, and through his knowledge of underwriting policies obtained on-the-job.

This Court will sustain the objection to matters for which there is no foundation other than hearsay.  However, any statements which are attributed to McCarter's personal review of the bank records or his personal underwriting experience at the bank will be admitted. Therefore, this objection is **SUSTAINED, in part** and **OVERRULED, in part.**

### 3. Joseph Grier's Affidavit and Attached Documents

Plaintiff also seeks to exclude the affidavit of the court-appointed receiver for the Peerless entities, Joseph Grier, and the attached documents because Defendants did not identify Grier as a person with relevant knowledge in their initial disclosures nor their interrogatory responses.  Rule 26(a) requires that a party disclose all names of witnesses upon whose testimony the party intends to rely at trial or during the pretrial motions stage of the case. It provides:

14

(a) Required Disclosures.
(1) Initial Disclosure.
(A) In General. Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:
(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

FED. R. CIV. P. 26.

A party must file these mandatory initial disclosures within 14 days after the parties' Rule 26(f) conference, id., and a party "must supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A). A failure to identify a witness as required by Rule 26(a) and (e) bars a party from offering that witness "to supply evidence *on a motion*, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37 (emphasis added); see also Cooley v. Great S. Wood Preserving, 138 F. App'x 149, at *10 (11th Cir. May 18, 2005).

Plaintiff maintains that because Defendants failed to disclose Grier as a person with discoverable knowledge, Grier's affidavit and attached documents are inadmissible.  Defendants argue that the failed disclosure was inadvertent; there was no attempt to conceal.  Further, they claim since the affidavit and related documents were turned over during discovery, Plaintiff was put on notice that Grier had relevant information and the mistake was harmless.

This Court is not persuaded.  Defendants had an obligation to disclose Grier under the Rules and their failure to do so bars this affidavit's use. Further, Plaintiff's receipt in discovery is not convincing as there were over 70,000 documents produced in discovery, only three of which involved Grier. Plaintiff's objection is **SUSTAINED** as to Grier's Affidavit and its related documents.

### 4. Neil O'Rourke's Bill of Information and Subsequent Plea Agreement

Additionally, Plaintiff challenges Defendants' reliance on the Bill of Information and Plea Agreement of Neil O'Rourke.  Neil O'Rourke joined the Peerless entities in 2004 and served as President and Vice President of Peerless during his tenure.  (Bill of Information, Dkt. No. [67-22] at 1).  The challenged

16

Bill of Information sets out a description of the Peerless fraud scheme and charges O'Rourke with conspiracy.  Further, the Plea Agreement demonstrates that O'Rourke plead guilty to the Peerless conspiracy; thus, the conspiracy existed.

Plaintiff claims these documents are irrelevant because the matter in issue is whether Carpenter was dishonest–not whether Peerless associates were. However, as seen above, relevance is a very liberal standard.  The fact that Peerless was involved in a conspiracy makes it more likely that Carpenter, as a Peerless associate, was also involved in the scheme.  Because Carpenter's honesty is at issue in this case, these documents are admissible and Plaintiff's objection is **OVERRULED**.

B. Federal's Second Notice of Objection

Plaintiff also moves this Court to exclude the following exhibits offered in support of Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment [78]: 1) "Portions" of Paragraphs 3, 7, 8, and 9 of Jason McCarter's Second Affidavit; 2) Federal's Claim File Note; and, 3) Expert Report of Anthony Di Santi. (See Plaintiff's Second Notice of Objection ("Pl.'s 2d Obj.") Dkt. No. [86] at 1-2).

### 1. "Portions" of Paragraphs 3, 7, 8, and 9 of Jason McCarter's Second Affidavit

Similar to its challenge above, Plaintiff is also challenging paragraphs within McCarter's Second Affidavit for lack of foundation and personal knowledge.  Specifically, Plaintiff is challenging: paragraph three, wherein McCarter opines about why UCB did not always give Carpenter instructions; paragraphs seven, eight, and nine, wherein he makes statements "to his knowledge" or that he does "not recall that" something occurred; and the substance of paragraph seven, in which he opines about why corporations dissolve and the ease of corporate reinstatement.

As seen above, this Court will **SUSTAIN, in part** Plaintiff's objection as it applies to knowledge McCarter obtained based on hearsay.  However, any knowledge that he would have as UCB's 30(b)(6) witness or pursuant to his experience on-the-job in the financial industry will be admissible.

### 2. Federal's Claim File Note

Plaintiff next seeks to exclude the Carolina First Claim Note.  UCB and Carolina First both filed claims under their respective bonds with Federal for losses sustained in the Penland lot deal.  The claim note at issue here is a note

18

which was written by a Federal employee regarding what another Federal

employee, Vic Stewman, said regarding the Carolina First claim.  Specifically,

Stewman is said to have "felt that the closing attorney [Carpenter] would

probably meet the definition of an employee in the bond." (Carolina First Note,

Dkt. No. [78-10]).

Plaintiff argues that the note is unauthenticated, irrelevant, and

inadmissible as hearsay.  First, Plaintiff seeks to exclude because the author is

not stated on the face of the document; thus, the document is not authenticated.

Defendants' respond that the document *came* from Federal and they are under

no obligation to depose Federal employees, especially when the deposition they

would have taken was already completed in the Carolina First litigation.

Generally, documents must be properly authenticated in order for them to

be considered on summary judgment. Burnett v. Stagner Hotel Courts, Inc., 821

F. Supp. 678, 683 (N.D. Ga. 1993).  However, courts "may consider

unauthenticated documents on a motion for summary judgment if it is apparent

that they will be admissible at trial." The Lamar Co., L.L.C. v. City of Marietta,

Ga., 538 F. Supp. 2d 1366, 1377 (N.D. Ga. 2008).  "To meet [the

authentication] standard [at trial], the proponent need only demonstrate a

rational basis for its claim that the evidence is what the proponent asserts it to be." <u>U.S. v. Coohey</u>, 11 F.3d  97, 99 (8th Cir. 1993).

Plaintiff's objection is overruled as to authentication. Defendants would be able to demonstrate a rational basis that the claim note is what they assert it to be because the document came from Federal and the author is known.  This document would be able to be authenticated at trial.

Further, Plaintiff challenges the relevancy of the claim note.  Its main concern is that the note relates to the other bank–Carolina First–and the statement in question occurred at a time when Federal did not have all the facts before it (i.e. the statement was based on Carolina First's reported version of the facts).  However, these concerns go to the weight of the evidence.  The fact that a Federal employee thought that Carpenter would be an **"Employee"** under Carolina First's similar bond is probative of Carpenter's status under UCB's bond.  However, the Court does note that Federal may not have been fully aware of Carpenter's role at the time the note was written because it was made at the beginning of the claims process; this will be weighed accordingly. However, the evidence is admissible, and Plaintiff's objection is **OVERRULED**.

Last, Plaintiff challenges the note as inadmissible hearsay.  Ultimately, the note must be evaluated as "double hearsay"–or a statement within a statement–because the author is writing about the statement of Vic Stewman. However, both of the declarants were agents of Federal and were speaking "concerning a matter within the scope of the agency or employment"–the author, in relaying relevant claims information, and Vic Stewman, in providing his expertise to the claims handler.  See Fed. R. Evid. 801(d)(2)(D). Therefore, Plaintiff's objection is **OVERRULED**  as both statements are non-hearsay admissions under Rule 801(d)(2)(D).

### 3. Expert Report of Anthony Di Santi

Plaintiff last challenges the expert report of Anthony Di Santi as unsworn and, alternatively, as not based on sufficient facts or sufficient reliability under Rule 702.  Anthony Di Santi has been licensed to practice law in North Carolina since August 1975 and is currently the President-elect of the North Carolina State Bar.  Dkts. [78-28] at para. 2; [96-1] at 10:21-25.  His expert opinions concern whether Carpenter's relationship with UCB rises to the level of an attorney-client relationship under North Carolina Real Estate Law. Dkt. No. [78-28] at 1.

21

First, Plaintiff challenges the report because it is unsworn. Generally, [u]nsworn statements do not meet the requirements of Fed. Rule Civ. Pro. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion." Carr v. Tatangelo, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003). However, when the expert has been deposed and the expert report was marked as an exhibit during the deposition, the report will be admissible.  Medtronic Xomed, Inc. v. Gyrus ENT, L.L.C., 440 F. Supp. 2d 1300, 1310 n.6 (M.D. Fl. 2006).  Here, Plaintiff deposed Mr. Di Santi and his expert report was marked as an exhibit during the deposition. Dkt. No. [96-1] at 8:25-9:3.  Therefore, the report will be admissible on this point.

Further, Plaintiff challenges the reliability of Di Santi's opinions by challenging their underlying factual basis. Federal Rule of Evidence 702 governs the admissibility of proposed expert evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The trial court, as the gate-keeper, must determine that the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a

22

factual dispute." <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579, 591 (1993)

(quoting <u>United States v . Downing</u> , 753 F.2d 1224, 1242 (3d Cir. 1985)). The

trial court must also "make certain that an expert . . . employs in the courtroom

the same level of intellectual rigor that characterizes the practice of an expert in

the relevant field." <u>Kumho Tire Co. Ltd. v. Carmichel</u>, 526 U.S . 137, 152

(1999). The Eleventh Circuit has synthesized the existing rules into a three-part

inquiry, instructing courts to consider whether: (1) the expert is qualified to

testify competently regarding the matters he intends to address; (2) the

methodology by which the expert reaches his conclusions is sufficiently reliable

as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony

assists the trier of fact, through the application of scientific, technical, or

specialized expertise, to understand the evidence or to determine a fact in issue.

<u>City of Tuscaloosa v. Harcros Chemicals, Inc.</u>, 158 F.3d 548, 562 (11th Cir.

1998), <u>reh'g and reh'g en banc denied</u>, 172 F.3d 884 (1999).

  With respect to the reliability of expert testimony, relevant factors include

"(1) whether the expert's theory can be and has been tested; (2) whether the

theory has been subjected to peer review and publication; (3) the known or

potential rate of error of the particular scientific technique; and (4) whether the

technique is generally accepted in the scientific community." U.S. v. Frazier,

387 F.3d 1244, 1262 (11th Cir. 2004) (quoting Quiet Tech. DC-8, Inc. v.

Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003)). "These factors

are illustrative, not exhaustive; not all of them will apply in every case, and in

some cases other factors will be equally important in evaluating the reliability of

proffered expert opinion." Id.  It is important to note that "expert testimony that

does not meet all or most of the Daubert factors may sometimes be admissible."

U.S. v. Brown, 415 F.3d 1257, 1268 (11th Cir. 2005).

  Plaintiff challenges that Di Santi lacks sufficient facts and is unreliable

because he did not review the complete loan files. Rather, Di Santi reviewed the

HUD-1 Settlement Statements, the pleadings of this and related cases,

Carpenter's depositions in other cases, and the criminal bills of information

against Peerless-affiliated persons.  Plaintiff maintains that UCB is required to

prove the dishonest conduct as to each specific file, so not reviewing the entire

file for each loan would be critical. Additionally, Plaintiff notes that Di Santi did

not know some facts which he himself admitted might change his opinion.

  Defendants contend that Di Santi states he did "generally" review the loan

files and that even if Di Santi did not know one fact, that deficiency would not as

a matter of law exclude Di Santi.  Instead, they contend, the appropriate

opportunity to challenge this alleged failure is through cross-examination as

opposed to complete inadmissibility. ( Defs.' Opp. to Pl.'s 2d Obj., Dkt. No. [96]

at 20 citing First Union Nat'l Bank v. Benham, 423 F.3d 855, 862 (8th Cir.

2005) ("'[T]he factual basis of an expert opinion goes to the credibility of the

testimony, not the admissibility, and it is up to the opposing party to examine the

factual basis for the opinion in cross-examination.'")(citation omitted)).

It should be noted as an initial matter that Plaintiff continually states that

Defendants have to prove their loss as to each individual loan, as opposed to an

overall scheme, but fail to point this Court to any applicable bond provision,

statute or case law which would confirm such an interpretation.

Notwithstanding this contention, this Court finds that Di Santi's opinions are

sufficiently reliable. Di Santi may have only "generally perused" the full loan

files of the approximately eighty loans  but he did specifically review all of the

HUD-1 settlement statements for each of the at-issue loans.  (See Dep. Di Santi,

Dkt. No. [96-1] at 6:24-7:5).  Further, he reviewed Carpenter's depositions, the

bills of information of the Peerless affiliates, and the pleadings which, in

combination with his own knowledge of North Carolina real estate law, made up

his opinion. The appropriate place to challenge Plaintiff's factual concerns is

cross-examination.  Plaintiff's objection is hereby **OVERRULED**.

**III. Cross-Motions for Summary Judgment**

A.      Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be

granted "if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter

of law."  FED. R. CIV. P. 56(c).  "The moving party bears 'the initial

responsibility of informing the . . . court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which

it believes demonstrate the absence of a genuine issue of material fact.'"

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004)

(quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.

2d 265 (1986) (internal quotations omitted)).  Where the moving party makes

such a showing, the burden shifts to the non-movant, who must go beyond the

pleadings and present affirmative evidence to show that a genuine issue of

material fact does exist.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The applicable substantive law identifies which facts are material.  <u>Id.</u> at 248.  A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law.  <u>Id.</u>  An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Id.</u> at 249-50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  <u>Patton v. Triad Guar. Ins. Corp.</u>, 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249-50 (internal citations omitted); <u>see also Matsushita</u>, 475 U.S. at 586

(once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist.  Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."  <u>Shaw Constructors v. ICF Kaiser Eng'rs, Inc.</u>, 395 F.3d 533, 538-39 (5th Cir. 2004).

Plaintiff moves for summary judgment on Count I of its Complaint for Declaratory Judgment (Carpenter's "Employee" status under the Bonds) and Counts I and III of UCB's Counterclaim (Breach of Insurance Contract and Bad Faith).  (<u>See</u> Pl.'s Br. Sum. Judg., Dkt. No. [65-2] at 1).  Additionally, Defendants have moved for Partial Summary Judgment regarding the following Insuring Clause 1 elements: (1) Carpenter's "Employee" status; (2) Carpenter's "dishonest acts"; and (3) Carpenter's "improper personal financial gains." (<u>See</u> Defs.' Br. Sum. Judg.,  Dkt. No. [67-1] at 15).

28

B. Carpenter's "**Employee**" Status under the Bonds

**1. Interpretation of a Financial Institution Bond**

In Georgia, the interpretive principles which apply to financial institution bonds mirror the interpretive principles for insurance contracts.  See Am. Cas. Co. v. Etowah Bank, 288 F.3d 1282, 1284 (11th Cir. 2002) (applying Georgia law) ("Insofar as the law applicable to the interpretative question at the center of this case is concerned, the [financial institution] bond is just another insurance policy.").  Such interpretation is generally a matter of law for the courts. Bituminous Cas. Corp. v. Advanced Adhesive Tech., 73 F.3d 335, 337 (applying Georgia law) (" . . .construction of a[n insurance] contract is a question of law for the court.").  Further, the Eleventh Circuit has summarized the principles applicable to insurance contract construction under Georgia law, and these principles guide this analysis. York Ins. Co. v. Williams Seafood of Albany, Inc., 223 F. 3d 1253, 1254-55 (11th Cir. 2000).

First, the Bond is considered as a whole to give effect to each provision. Id.  Second, "If the terms of [a bond] are unambiguous, clear, and capable of only one reasonable construction, they must be taken in their plain, ordinary, and popular sense as may be supplied by common dictionaries." Id. (citation

29

omitted). The relevant inquiry is what a reasonable person in the position of the insured would understand the terms of the bond to mean, and the bond should be read as a layman would read it. See id. at 1255. Hence, if the bond would be confusing to a layman, the bond is ambiguous, and it will be construed against the drafter. Exclusions are read narrowly because the insurer has a duty to define limitations on coverage in clear and explicit terms. Id.  The Bond coverage here will be determined in accordance with the construction rules outlined above.

### 2. Discussion

Plaintiff claims that Carpenter does not meet the definition of **"Employee"** under the Bonds' Insuring Clause 1.[2]  For Carpenter to satisfy the "**Employee**" provision, he must: 1) have been "retained" by UCB, and 2) have been "performing legal services" for UCB.  As a preliminary note, there appears to be no disagreement between the parties that Carpenter was performing legal services for UCB.  (See Pl.'s Br. Sum. Judg., Dkt. No. [65-2]; Pl.'s Opp. Br., Dkt. No. [73] (including no discussion of whether Carpenter was "performing legal services")).  Further, this agreement is adequately supported by the record.

---

[2]Both parties agree that the Excess Bond and the Primary Bond share the same applicable terms and conditions for the purposes of these motions. (See Pl.'s Br. Sum. Judg., Dkt. No. [65-2] at 2 n.1; Defs.' Br. Sum. Judg., Dkt. No. [67-1] at 5 n.2).

Carpenter acted as the closing attorney in the at-issue loans and completed such

legal tasks as approving HUD-1 Settlement Statements, searching titles,

rendering title opinions, and memorializing the real estate transactions. (Defs.'

Stmt. Mat. Facts, Dkt. No. [67-2] at ¶¶ 33-34).  In fact, Carpenter himself

admitted that he "did at times provide real estate transaction services with

reference to the Village of Penland development to the . . .lender . . ." Id. at ¶ 34.

Therefore, there is no genuine issue of material fact as to the second prong;

Carpenter performed legal services for UCB.

       The crux of the dispute here is whether UCB "retained" Carpenter as

required by the Bonds.  As seen above, when a term is not defined in the

bond–as this one is not–courts are to first look to the plain and ordinary meaning

of the term from a layman's perspective.  Plaintiff cites three dictionary

definitions which it says supports an interpretation that "retained" requires clear

and active selection of the attorney, i.e. the lender must be the one to

affirmatively choose the attorney.[3]  Defendants, in response, cite the Black's

_____

[3]Plaintiff cites:

American Heritage Dictionary of the English Language (4th ed. 2009) (to
'retain' is '[t]o hire (an attorney, for example) by the payment of a fee');
Random House Dictionary (2009) (defining 'retain' as 'to engage, esp. by

Law Dictionary for their position that "retained" more appropriately means "[t]o engage the services of an attorney or counselor to manage a specific matter or action . . ." BLACK'S LAW DICTIONARY 1316 (6th ed. 1990).

This Court finds as a matter of law that Defendants' definition is what a lay person would understand "retain" to mean. A closing attorney is typically the lender's only representative at residential real estate closings. A reasonable person would expect that such representative would be covered under a financial institution bond–a bond whose purpose is to "insure financial institutions against fraudulent or unfaithful dealings by employees and certain outside parties which could damage the institution." Am. Cas. Co., 288 F.3d at 1284. Moreover, as the lender's sole representative at the table, the closing attorney would be in the best position to critically affect the bank's business by changing the HUD-1 Settlement Statement or manipulating the financial records. By engaging the attorney to manage the specific loan, a reasonable bank would assume that

_____

payment of a preliminary fee: *to retain a lawyer*') (emphasis in original); Merriam-Webster's Dictionary of Law (1996) ('retain' means to keep in one's pay or service; *specifically*: to employ (as a lawyer) by paying a retainer').
 Pl.'s Br. Sum. Judg., Dkt. No. [65-2] at 24 n.10.

person would be its employee.  Therefore, "retained" means "to engage the services of an attorney or counselor to manage a specific matter or action."[4]

Under such a definition, Carpenter was, as a matter of law, UCB's "**Employee**" under the Bonds.  UCB engaged Carpenter to manage the closing of the specific loans in question.  The fact that the borrower first selected Carpenter does not change the fact that UCB subsequently engaged that attorney by allowing him to do such things as obtain title insurance–on UCB's behalf–or to approve the critical HUD-1 Settlement Statements which outlined the sources of funds and payments made.[5]  Further, Carpenter was on UCB's list of

---

[4]Plaintiff cites Johnson v. Schultz, 671 S.E.2d 559 (N.C. Ct. App. 2009) for the proposition that "representation" does not mean "retain" in North Carolina.  In Johnson, the court was deciding who should bear the risk of loss when a closing attorney misappropriates escrow funds by applying the "entitlement" rule which requires a determination of attorney-client relationships.  The Johnson holding is not dispositive of the inquiry in the present case–a determination of the plain and ordinary meaning of "retained" under the Bonds.

[5]Plaintiff points this Court to Moultrie National Bank v. Travelers Insurance Co., 275 F.2d 903 (5th Cir. 1960) for the proposition that a title search would not meet the definition of "an attorney retained by the bank."  This Court does not disagree.  However, that case is not persuasive as Carpenter did more than a simple title search.  Carpenter approved the HUD-1 Settlement Statements, served as the trustee on the deeds of trust, received and disbursed the loan proceeds, and ultimately processed the closing documents.  (Pl.'s Resp. Facts, Dkt. No. [74] at ¶¶ 32-35; B. Miller 3rd 30(b)(6) Dep., Dkt [67-15] at 6:14-23).

AO 72A
(Rev.8/82)

approved attorneys–even if that list was long. (Pl.'s Resp. Facts, Dkt. No. [74] at ¶29).

Plaintiff additionally argues that because Carpenter did not receive an IRS Form W-2, or even payment from UCB directly, Carpenter is not an employee. While receipt of a W-2 Statement is specified as one means of becoming an "**Employee**" under the Bond,[6] receipt of a W-2 is not the exclusive means of becoming an **"Employee."**  The fact that one definition of **"Employee"** is specifically based on receipt of a W-2 suggests that receipt of a  W-2 is not needed to meet any of the other definitions of "**Employee**." It also should be noted that it is common practice in real estate for the lender's closing attorney to be paid by the buyer or seller–not by the lender directly. (Di Santi's Expert Rep., Dkt. No. [78-28] at 4).

---

[6]The relevant provision states:

k. **Employee** means:

(2) a natural person while in the regular service of the ASSURED at any of the ASSURED'S premises and compensated directly by the ASSURED through its payroll system and subject to the United States Internal Revenue Service Form W-2 . . .and whom the ASSURED has the right to control and direct both as to the result to be accomplished and details and means by which such result is accomplished in the performance of such service."

(Primary Bond, Dkt. No. [67-5] at 11).

But even if the plain and ordinary meaning of "retained" is ambiguous as between the parties' understandings, Carpenter would still be UCB's "**Employee**" under the Bonds.  The law of Georgia dictates:

> [I]f a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied. The proper construction of a contract, and whether the contract is ambiguous, are questions of law for the court to decide.

Ins. Co. of Penn. v. APAC-Se., Inc.  677 S.E.2d 734, 738 (2009) (citations omitted).  Further, "ambiguities  in an insurance contract shall be construed most favorably toward the insured and most strongly against the insurer. This is particularly true where construction of an exemption or exclusion is at issue." Broome v. Allstate Ins. Co., 241 S.E.2d 34, 35 (Ga. Ct. App. 1977). Plaintiff characterizes the "**Employee**" provision as a "narrow exception to the loan loss exclusion for certain loan losses directly caused by a bank employee's dishonest acts." (Pl. Br. Sum. Judg., Dkt. No. [65-2] at 4-5).  Especially since the insurance company itself–Plaintiff–characterizes the provision as an exclusion, this Court will construe "retained" most favorably toward the insured.  Doing so, Carpenter meets the definition of an **"Employee"** under the Bonds as "retained"

would encompass the Black's Law Dictionary definition - "to engage the services of an attorney or counselor to manage a specific matter or action."

In sum, as a matter of law Carpenter meets the requirement to be an **"Employee"** under the Bonds.  Therefore, Plaintiff's Motion for Summary Judgment as to Count I of its Complaint for Summary Judgment and Count I of Defendants' Counterclaim (Dkt. No. [65]) is **DENIED** and Defendants' Partial Motion for Summary Judgment is **GRANTED** (Dkt. No. [67]) as to Carpenter's Employee status.

C. Carpenter's "Dishonest Acts"

Defendants move for partial summary judgment on whether Carpenter committed "dishonest acts" under the Bonds. (See Defs.' Br. Sum. Judg., Dkt. No. [67-1] at 25-30). "Dishonest acts" is also not defined under the Bonds.  But, the Fifth Circuit has opined on such a clause:

> Fidelity bonds covering losses caused by "dishonest or fraudulent acts" are to be broadly construed, and, as with other insurance contracts, any ambiguity is construed most strongly against the underwriter. The employee's acts need not be criminal, nor is it necessary that the employee personally benefit nor have intended to benefit from his wrongful conduct. Nevertheless, as the cases universally recognize, in order for there to be liability on the bond, there must be something more than negligence, mistake, carelessness, or incompetence.

Eglin Nat'l Bank v. Home Indem. Co., 583 F.2d 1281, 1285 (5th Cir. 1978).

Defendants claim that Carpenter's acts were dishonest in: 1) certifying false HUD-1 Settlement Statements; 2) failing to disclose to UCB that the Statements were false; 3) failing to disclose that Carpenter had an improper interest in closing the loans; and 4) failing to disclose the existence of the Penland Lot "scheme."

Plaintiff responds that, at a minimum, there is a genuine issue of material fact as to this Bond requirement.  Plaintiff most convincingly contends that Elizabeth Holmes, the closing attorney who began to close a majority of the loans after Carpenter had a "falling out" with Peerless, filled out the HUD-1 Settlement Statements in the same manner that Carpenter did–by putting the equity payment made by Peerless on line 303 (indicating the funds had come from the buyer at closing).  (Compare Dkt. No. [85-6] at 23706 with Dkt. No. [85-5] at 26068).   She explained that Peerless had told her that the buyer had paid Peerless directly–which is "not an unusual practice where there is no escrow agent." (Holmes Aff., Dkt. No. [73-10] at ¶12).  This Court finds that there is a genuine issue of material fact as to Carpenter's dishonesty, specifically as to what Carpenter knew and was told by Peerless and UCB.  Therefore,

Defendants' Motion for Partial Summary Judgment is **DENIED** as to

Carpenter's dishonest acts.

### D. Carpenter's Improper Personal Financial Gain

Defendants also move this Court to find that Carpenter obtained an

improper personal financial gain as a result of his closings with UCB. (See

Defs.' Br. Sum. Judg., Dkt. No. [67-1] at 30-34).  While the phrase "improper

personal financial gain" is not defined in the affirmative, it is defined in the

negative. "[I]mproper personal financial gain shall not include salary, salary

increases, commissions, fees, bonuses, promotions, awards, profit sharing,

incentive plans, pensions, or other emoluments received by an **Employee**."

(Primary Bond, Dkt. No. [67-5] at 1 of 23).

Defendants maintain that Carpenter obtained an improper financial benefit

by collecting loan proceeds to satisfy an unrelated debt and through "insider

transactions" in which Peerless paid off Carpenter's land or swapped it  for other

land.  Plaintiff counters that Carpenter was receiving payment for "fees"

previously incurred–prior surveying, engineering, and legal services.

Additionally, they note that these fees were disclosed on the HUD-1 Settlement

Statements and UCB employees were aware that these payments were being

made.  (Edwards Dep., Dkt. No. [67-17] at 103-04).  As such, there is a genuine issue of material fact as to whether Carpenter's financial benefit was improper under the Bonds.  Defendants' Partial Motion for Summary Judgment as to Carpenter's "Improper Personal Financial Gain" is hereby **DENIED**.

E. Bad Faith

Plaintiff additionally moves the Court for the entry of summary judgment in its favor on the issue of liability under O.C.G.A. § 33-4-6. That statute authorizes the supplemental award of up to fifty percent of the liability of the insurer, plus attorney's fees, when the insurer is found to have refused to make payment under a relevant policy in "bad faith." O.C.G.A. § 33-4-6(a).

In the context of insurance, bad faith means "any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy." Interstate Life & Accident Ins. Co. v. Williamson, 138 S.E.2d 668, 669 (Ga. 1964) (quoting Royal Ins. Co. v. Cohen, 125 S.E.2d 709, 711 (Ga. Ct. App. 1962)). When the insurer's refusal to pay the claim rests on unsettled areas of the law, or involves bona fide disputes as to the facts supporting the insured's claim, relief under the statute is unavailable. See Grange Mut. Cas. Co. v. Law, 479 S.E.2d 357, 359 (Ga. Ct. App. 1996) ("The

39

jury was not authorized to award the [insured] bad faith penalties if [the insurer] had any reasonable ground to contest the claim and there were disputed questions of fact."); U.S. Fid. & Guar. Co. v. Woodward, 164 S.E.2d 878, 881 (Ga. Ct. App. 1968) ("[O]ur courts have consistently held that no bad faith exists where there is a doubtful question of law involved. Where the questions of law involved in a case are intricate and difficult of solution, the insurer has the right to contest payment of the claim and is not guilty of bad faith in refusing to pay it.") (internal citations omitted). The insured bears the burden of establishing bad faith. Interstate Life, 138 S.E.2d at 669.

Plaintiff maintains that they did not commit bad faith in refusing to make payment to the Defendants.  First, Plaintiff claims its investigation was timely as it was complex.  Georgia law allows an insurance company to investigate before issuing a coverage determination. See Ga. Farm Bureau Mut. Ins. Co. v. Murphy, 411 S.E.2d 791, 793 (Ga. Ct. App. 1991).  Federal investigated eighty-three loans in relation to UCB's claim, reviewing thousands of documents and personally interviewing UCB employees. (Dec. Maillet, Dkt. No. [65-21] at ¶8). This process took approximately thirteen months from UCB's initial loss notice

until Federal made its coverage determination–from June 20, 2007 to July 7,
2008. Id. at ¶¶ 6, 13.

Additionally, Plaintiff claims its denial was not frivolous.  Namely,
Federal states that it had a reasonable basis for denying Federal's claim.  This
Court agrees.  Defendants point to no real evidence that Federal acted
improperly.  Their main contention is that they were reviewed jointly with
Carolina First due to Federal's incentive to avoid a huge payout by denying both
claims.  However, Defendants themselves note that the Carolina First claims
occurred on a bond "virtually identical" to their own.  Dkt. No. [78] at 26.   It is
much more likely that these claims were reviewed together because they
involved "virtually identical" bonds and a similar underlying factual basis.
Further, Defendants themselves noted in their evidentiary-objection response
that the Carolina First scenario was so similar that evidence from that case was
probative here.  But, most importantly, there is no evidence that the coverage
decisions for UCB and Carolina First were not made independently.  Bare
allegations are not enough.

Defendants also make broad accusations that Federal conducted a one-
sided investigation, but UCB's own 30(b)(6) witness noted that they were able to

ask additional questions if they felt Federal's were insufficient. (Miller Dep., Dkt. No. [78-19] at 33:16-20). Ultimately, Federal had a reasonable basis to deny the claim. In fact, this Court is unable to resolve some of the claims before it because there are genuine issues of material fact. For all these reasons, Plaintiff's Motion for Summary Judgment on Count III of Defendants' Counterclaim is **GRANTED**.

## IV. Conclusion

Based on the foregoing, Plaintiff's Objection to Grier's Affidavit (Dkt. No. [76]) is **SUSTAINED.** However, Plaintiff's Objection to O'Rourke's Bill of Information and Plea Agreement (Dkt. No. [76]) and Plaintiff's Objection to Di Santi's Expert Report (Dkt. No. [86]) are **OVERRULED**. Additionally, the following objections are **SUSTAINED, in part** and **OVERRULED in part**: Plaintiff's Objection to McCarter's Affidavit (Dkt. No. [76]); Plaintiff's Objection to the North Carolina Bar Order (Dkt. No. [76]); and, Plaintiff's Objection to McCarter's Second Affidavit (Dkt. No. [86]).

The following motions for summary judgment are **GRANTED**: Defendants' Motion for Partial Summary Judgment as to Carpenter's **"Employee"** status (Dkt. No. [67]) and Plaintiff's Motion for Summary

42

Judgment as to Count III of Defendant's Counterclaim (Bad Faith)(Dkt. No.

[65]).  As well, this Court has **DENIED** Plaintiff Federal Insurance Company's

Motion for Summary Judgment as to Count I of its Complaint for Declaratory

Judgment and Count I of Defendants' Counterclaim (Dkt. No. [65]) and

Defendants United Community Banks, Inc. and United Community Bank's

Motion for Partial Summary Judgment as to Carpenter's "Dishonest Acts" and

"Improper Financial Gain"(Dkt. No. [67]).

     **SO ORDERED** this   24th   day of September, 2010.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)